UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- x
UNITED STATES OF AMERICA            :
                                    :
            -v-                     :       06-CR-150(JSR)
                                    :
MICHAEL MATERASSO,                  :       FINDINGS OF FACT
                                            AND CONCLUSIONS OF LAW
            Defendant.              :
------------------------------------- x

JED S. RAKOFF, U.S.D.J.



On July 12, 2007, defendant Michael Materasso pled guilty to conspiracy to distribute and possess with intent to distribute methamphetamine, GHB, and Ketamine in violation of 21 U.S.C. § 846; possession of a firearm in violation of 18 U.S.C. § 922(g)(1); possession of a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c); and altering records with intent to impair the availability of those records for use in an official proceeding in violation of 18 U.S.C. § 1512(c). See ECF Dkt. No. 57. The Court sentenced defendant to thirty months' imprisonment to be followed by three years' supervised release. Id. Since his release from prison, defendant has committed violations of the terms and conditions of his supervised release on four separate occasions, including failure to submit to drug testing, use of controlled substances, possession of controlled substances, possession of drug paraphernalia, felony possession of a firearm, failure to notify the United States Probation Department ("Probation") of a change in residence, and failure to participate in a Court-ordered residential

1

substance abuse treatment program. See ECF Dkt. Nos. 90, 116, 131, 140.

On November 12, 2014, Probation charged defendant with committing four still further violations. Specification 1 charges that, on or about November 5, 2014, defendant committed unlawful imprisonment in the second degree in violation of New York Penal Law § 135.05, in that he tied his wife, Irma Materasso, to a chair. Specification 2 charges that defendant endangered the welfare of a child in violation of New York Penal Law § 260.10, in that he committed the November 5, 2014 incident in front of his three-year-old daughter. Specification 3 charges that defendant committed aggravated harassment in the second degree in violation of New York Penal Law § 240.30, in that he threatened to kill Mrs. Materasso in a telephone call on or about November 8, 2014. Specification 4 charges that, on or before November 8, 2014, defendant used methamphetamine.

On December 18, 2014, defendant admitted Specification 4, and the Court revoked his supervised release on the basis of that admission. He denied Specifications 1, 2, and 3. By letter dated January 14, 2015, the Government informed the Court that it no longer intended to call Mrs. Materasso as a witness and would accordingly be unable to sustain its burden with respect to Specifications 2 and 3, which, therefore, are hereby dismissed. On January 20 to 23, 2015, the parties presented evidence concerning Specification 1. On January 30, 2015, the Court issued a "bottom-line" order finding that the Government had failed to meet its burden of proof with respect to

Specification 1. The following findings of fact and conclusions of law set forth the basis for that bottom-line ruling.

The Government bears the burden to prove "by a preponderance of the evidence that the defendant violated a condition of supervised release." 18 U.S.C. § 3583(e)(3). Under New York Law, a person is guilty of unlawful imprisonment in the second degree if he "restrains another person," which is defined as "restrict[ing] a person's movements intentionally and unlawfully in such manner as to interfere substantially with his liberty … without consent and with knowledge that the restriction is unlawful." N.Y. Pen. L. §§ 135.00, 135.05. With respect to this Specification, the Government alleges that, in the early morning hours of November 5, 2014, defendant forcibly stripped his wife, Irma Materasso, down to her undergarments and tied her hands behind her back while she sat in a dining chair in the living room of the couple's apartment. Defendant denies that this incident occurred, and posits that his wife fabricated it as part of an elaborate conspiracy to abduct the couple's two young children and take them back to the Netherlands, the country of her nationality.

In support of its allegations, the Government introduced the testimony of three witnesses. Its primary witness was Nadija Nezirovic, Mrs. Materasso's mother, who testified with the aid of a Dutch interpreter. Ms. Nezirovic, who resides in the Netherlands, testified that she visited her daughter and son-in-law in New York from October 14 to November 5, 2014, during which time she stayed with them at their apartment in Manhattan. See Transcript dated Jan. 20-23,

3

2015 ("Tr.") at 8. During that time, she witnessed a number of heated verbal altercations between defendant and her daughter. Tr. 9-12. In one such incident, her daughter became very angry because she had obtained defendant's bank statements, which revealed that he had spent substantial sums of money at spas she believed to be purveyors of sexual services. Tr. 11, 346-47. According to Ms. Nezirovic, this altercation took place several days before November 5, 2014. Tr. 346. Defendant, when he subsequently took the stand, admitted that this altercation occurred and that he had, in fact, patronized such spas for sexual services, which he falsely denied to his wife. Tr. 272-76. However, he testified that the altercation took place on November 4, 2014, the night before the alleged restraining incident occurred. Id.

Ms. Nezirovic also testified about an incident involving physical violence that had occurred on a previous visit, around February 2013. On that occasion, after taking the dog for a walk, she returned to the house where her daughter and defendant were living at the time. Tr. 20. There, she found Irma crying on the couch amid shards of glass from a window that had been broken, letting in the winter chill. Id. The defendant did not return to the house that night. Id. This incident was corroborated by defendant's mother, Donna Materasso, Tr. 261-62, and by defendant himself, who admitted that he had kicked a plastic high chair into a window and then did not come home for two days. Tr. 329-30.

As relevant to the instant charges, Ms. Nezirovic testified that November 5, 2015 was the day she was planning to return to the

4

Netherlands. Before sunrise that morning, however, she was awakened by the sound of defendant and her daughter's raised voices in the living room. She got out of bed and opened the door to the guest bedroom where she had been sleeping, which adjoined the living and dining room. There, she observed Irma sitting in a chair at the dining room table with her hands behind her back, wearing no clothes. She then noticed that her daughter's hands were tied. The defendant, who was fully clothed, was standing next to her daughter. When he saw Ms. Nezirovic, he looked angrily at her, then loosened the rope that was binding Irma's hands. He took his coat from the closet and left. Tr. 12. Ms. Nezirovic asked Irma what the matter was. Tr. 69. Without saying anything, Irma got up from the chair and went into the master bedroom to attend to her older daughter, who was crying audibly. At that point, Ms. Nezirovic observed that her daughter was wearing underwear. Tr. 13.

Ms. Nezirovic testified that, shocked, she returned to her bedroom but was unable to fall asleep. After about half an hour, she got up and made coffee. When Irma eventually emerged from the master bedroom, Ms. Nezirovic told her daughter that she believed it was not safe for her to stay the apartment that she shared with defendant, and encouraged her to go somewhere else. Tr. 13-14. Irma called the number for a domestic violence hotline, which someone from child protective services had provided to her a few weeks earlier. After Irma had a long, tearful conversation with the person on the hotline, Irma told Ms. Nezirovic that there was a shelter where she could stay with the

5

two children. Tr. 16-17. Ms. Nezirovic helped pack up some provisions and looked after the children while her daughter took the couple's pit bull, Jack, to the groomer. Tr. 17.

The Government next called Tawana Roberts, a case manager at the Aegis Domestic Violence Program. Ms. Roberts testified that Mrs. Materasso stayed at her organization's domestic violence shelter from November 5 to 11, 2014, and explained that the shelter provides emergency housing to victims of domestic violence for ninety days, as well as food and childcare supplies. Tr. 82-87.

Finally, the Government called George Olivares, the United States Probation Officer responsible for supervising defendant. Officer Olivares testified that defendant failed to appear for a drug test on October 2, 2014; that he was excused from another drug test on October 27, 2014; and that the results of his test on October 30, 2014 were negative, but indicated that the sample had been diluted. Tr. 102. Defendant's drug test records indicate, however, that he tested negative on both November 4 and 5, 2014. Government's Exhibit ("GX") 5. Officer Olivares also testified that the paystubs that defendant submitted as verification of his employment were missing the weeks of October 6 and 13. Tr. 99.

Defendant gave a very different account of the events of early November 2014. On the stand, he testified that, after he returned home from work on November 4, 2014, his wife confronted him with the suspicious charges on his bank statements. Tr. 272-75. After the two fought about it, he went to bed. At that time, Irma was still in the

6

other room with her mother. Tr. 276-77. When he woke up on the morning of November 5, 2014, Irma was in bed, asleep, with him and their two daughters. He got up to take a shower, and when he came out of the bathroom, Ms. Nezirovic was sitting at the dining room table. Tr. 278-80. He attempted to greet her but she pulled away, so he left for work. Tr. 284. After work, he reported to Officer Olivares, at which time he took a drug test. Tr. 287-88. Officer Olivares instructed him to report to a drug treatment program for registration, which he did. Tr. 288-89.

When he got home that evening, Irma and the children were gone, as were their clothing and the televisions. Tr. 289. He discovered a note from his wife on the back of one of the bank statements, which stated, "I hope you enjoyed your happy ending."[1] Tr. 290. After he learned that Irma and the children were in a shelter, he attempted, unsuccessfully, to contact her. Tr. 291-92. Soon thereafter, he suffered a drug relapse, which he reported to Officer Olivares. Tr. 293. This relapse was the basis for Specification 4. On November 11, 2014, Irma contacted him and asked him to pick her up from the shelter. Tr. 295. Defendant and his father brought Irma and the children to his parents' home in Westchester, where they spent the night together. Defendant was arrested the next day. Tr. 296-87.

The defense also called defendant's mother, Donna Materasso, who corroborated that Irma came to stay with her and her husband around

---

[1] This statement was received for the sole purpose of showing Irma Materasso's motivation.

7

this time, and that Irma and defendant shared a room with their two children the night before before defendant was arrested. Tr. 184-85. Finally, the defense called two employees of the New York City Administration for Children's Services ("ACS"), Patrice Cox and Carol Warner. Ms. Cox's testimony was not material, and Ms. Warner's testimony will be discussed below.

Notwithstanding defendant's sordid history, the Government's limited proof on Specification 1 made this a far closer case than the average matter of this nature. It rested chiefly on Ms. Nezirovic's eyewitness testimony that defendant restrained his wife to a chair on the morning of November 5, 2014. While the Court discounts the minor discrepancies in Ms. Nezirovic's description of the layout of the apartment and the like, the Court finds that Ms. Nezirovic was less than candid regarding an email that she sent to Donna Materasso on December 17, 2014 asking her to provide financial support to Irma. While the email itself was largely immaterial to the present allegations, Ms. Nezirovic's evasiveness on the subject was telling. The Court received into evidence three versions of the email, all of which contained identical substance. The first was sent from Mrs. Materasso's iCloud account to Ms. Nezirovic, and was time stamped "December 17, 2014 7:54:02 AM." DX 65. The second was sent from Ms. Nezirovic to Donna Materasso, and was time stamped "2014-12-17 11:12 GMT-05:00."[2] DX 44. The third was sent from Damir Nezirovic, Mrs.

---

[2] The Court takes judicial notice of the fact that the notation "GMT-05:00" means Greenwich Mean Time minus five hours and thus refers to Eastern Standard Time, which was applicable in New York in the

8

Materasso's brother, to Mrs. Materasso's Hotmail account, and was time stamped "2014-12-17 11:19 GMT-05:00." See Court Exhibit ("CX") 3. Although email time stamps may sometimes be inaccurate, particularly where multiple time zones are involved, the time stamps on these emails appear to indicate that they were sent in the sequence described above.

On her first day of testimony, Ms. Nezirovic testified that she had written the email and that her son, Damir, had translated it into English for her to send to Donna. When asked by defense counsel, "Isn't it true that your daughter Irma wrote that e-mail in English for you to send to Donna?" she replied, "No. Never." Tr. 62-63. The Court then called Irma Materasso as a Court witness to explain the origin of the email.[3] She testified that she had given her brother the relevant information, he had drafted it and sent it to her to review, she then forwarded it to her mother, who forwarded it to Donna Materasso. Tr. 304-08. When the Court re-called Ms. Nezirovic for further questioning on this subject, however, she insisted that she, not Irma, had provided her son with the information to include in the email. Tr. 356. She testified that her son had composed the email at her direction but had sent it to Irma, who, recognizing that the email was intended for her mother, then forwarded it to Ms. Nezirovic. Tr.

---

relevant months.

[3] Since both sides had indicated that they would not call Mrs. Materasso, and since her attorney, present in court throughout much of the hearing, had indicated she would invoke her Fifth Amendment privilege on certain subjects, the Court limited its inquiry to a very few matters reflecting on Ms. Nezirovic's credibility.

9

355-57.

Thus, Ms. Nezirovic's and Mrs. Materasso's accounts differed as to who provided the information contained in the email. Moreover, the email time stamps appear to indicate that Damir sent the email to Mrs. Materasso <u>after</u> Mrs. Materasso sent it to Ms. Nezirovic.[4]

These inconsistencies undermine Ms. Nezirovic's credibility. In addition, the email itself contains an untruth. In the email, Ms. Nezirovic states that her daughter "has sold everything she could .Her tv,phones [sic] and even her clothes that were worth anything." CX E. However, photographs of the apartment that Ms. Nezirovic took on January 20, 2015 and submitted to the Court clearly show a television. CX B & C. The Court infers that Ms. Nezirovic is prepared to bend the truth in order to help her daughter. Although fibbing in an email to one's in-laws is very different from lying under oath, the Court finds that this example sows further doubt about Ms. Nezirovic's truthfulness.

Whether the Court's doubt about Ms. Nezirovic's credibility would be sufficient in itself to defeat the Government's case on Specification 1 is not a question the Court need reach, however, for the Government's case had other substantial weaknesses. In particular,

---

[4] In addition, Damir sent the email to Mrs. Materasso at her Hotmail address, whereas Mrs. Materasso's email to her mother was sent from her iCloud address, suggesting that she had not simply forwarded her brother's email to her mother, as the two of them claimed. However, the witnesses were not given an opportunity to explain this apparent discrepancy. It is possible, for example, that both Mrs. Materasso's email addresses are linked to the same inbox. Accordingly, the Court has not factored it into its decision.

10

defendant elicited testimony that Mrs. Materasso failed to report the November 5, 2014 incident to anyone until several days later. In an ordinary case, the victim's failure to report her abuse in a timely fashion would not necessarily suggest that it did not occur, as it is all too common for victims of domestic violence to remain silent. But there was evidence before the Court that Mrs. Materasso was a strong-willed woman who had not hesitated in other instances to speak her mind. In this case, Mrs. Materasso had multiple opportunities to report the incident, and the circumstances were such that, if it had happened as described by Ms. Nezirovic, she most likely would have done so.

For example, right after the alleged incident on November 5, 2014, Mrs. Materasso, as described above, entered the Aegis domestic violence shelter. As part of the intake process, she was interviewed by personnel from both the domestic violence hotline and the shelter itself, and her responses were duly recorded. These records, however, contained no reference whatsoever to the incident that had allegedly occurred that very morning. See Defendant's Exhibit ("DX") 50. To the contrary, in response to the question, "Is admission due to a new incident of violence," Mrs. Materasso answered yes, but listed the date of said incident as October 25, 2014. Tr. 85; DX 50, at 618. A separate phone intake form generated by the domestic violence hotline also listed the "date of most recent incident" as October 2014. This form contained a note stating that "He choked her until she was unconscious + then he fled. Didn't go to hospital, didn't call the

11

police." Id. at 628-29. Finally, a client assessment form dated November 5, 2014 reports that "Client stated the most recent incident was 2 weeks ago when OP was choking the client and she passed out." DX 50, at 632. Given Ms. Nezirovic's testimony that the November 5, 2014 incident was the proximate cause of Mrs. Materasso's decision to go into the shelter, one would expect her to have mentioned it during the extensive interviews that took place during the intake process. By contrast, her failure to report it, even while alleging earlier incidents of violence, was consistent with the defense theory that she left because of defendant's cheating on her and verbally fighting with her, but needed to allege some prior incidents of violence to gain entry to the shelter.

Furthermore, Mrs. Materasso also exchanged a series of text messages with Officer Olivares that same day. In this exchange, she informed him that she had gone to a shelter and reported that defendant had gone on two drug binges over the past month. She further told Officer Olivares that: "He stripped me naked last week when he was high and paranoid I was hiding his drugs." When Officer Olivares asked for the date of that incident, she claimed that it occurred on October 27, 2014 at 6 AM. This exchange makes it apparent that Mrs. Materasso had numerous complaints about her husband and was not shy about voicing them to defendant's Probation Officer. Indeed, the incident she reported as having taken place on October 27 was strikingly similar to that which is now alleged to have occurred on November 5. If it were the case that her husband had actually stripped

12

her twice, with the second time having taken place that very morning, it is highly likely that she would have mentioned it. But she did not. Tr. 118-22; DX 4A.[5]

Also on November 5, 2014, Mrs. Materasso contacted Carol Warner, a child protective specialist at ACS. Ms. Warner testified that Mrs. Materasso called to inform her that she had gone to a shelter, but made no mention of the tying-up incident. Tr. 149-50. To the contrary, she represented to Ms. Warner that nothing in particular had happened to cause her to leave her home.[6] Tr. 150. Additionally, defendant's mother, Donna Materasso, testified that she spoke with Irma twice on November 5, 2014, but that her daughter-in-law said nothing about defendant having been abusive to her that morning. Tr. 183. To be sure, Mrs. Materasso's silence towards these two witnesses is less probative than her silence towards the shelter personnel and Officer

---

[5] The Court received Officer Olivares' log of the November 5, 2014 text message exchange for the purpose of demonstrating the absence of any reference to the November 5, 2014 incident. Tr. 120-21. Mrs. Materasso's statement regarding the October 27, 2014 incident was received for the purpose of demonstrating that she was willing to report incidents of this nature to Probation. Tr. 121-22.

[6] The Court permitted Ms. Warner to testify, without deciding whether that testimony would be admitted, that Mrs. Materasso did eventually report the incident to her, but not until five days later, on November 10, 2014. The Court need not decide this issue here, as admitting this testimony would only have magnified the problems with the Government's case. Mrs. Materasso's explanation for her delay in reporting the abuse was that she did not consider the incident as "violent." However, in light of Ms. Nezirovic's testimony that the November 5, 2014 incident prompted Mrs. Materasso to enter the shelter, this does not explain Mrs. Materasso's statement to Ms. Warner that nothing had happened to prompt her to go into the shelter. Moreover, Ms. Warner testified that Mrs. Materasso told her on November 10, 2014 that Ms. Nezirovic had been asleep during the incident. Tr. 152-55.

13

Olivares. With respect to Ms. Warner, she may have feared the consequences of disclosing abuse within the home to an ACS Official. And regarding Donna Materasso, she may not have wanted to discuss this topic out of embarrassment or a desire to preserve the relationship. In the aggregate, however, Mrs. Materasso's failure to mention this incident to anyone the day it occurred, despite multiple instances when she could have been expected to do so, is highly damaging to the Government's case.

Finally, the Court draws an adverse inference from the fact that the Government failed to call Mrs. Materasso to the stand. "It is well-settled that a party's failure to call a witness may permissibly support an inference that that witness's testimony would have been adverse." Revson v. Cinque & Cinque, P.C., 221 F.3d 71, 81 (2d Cir. 2000) (citing Graves v. United States, 150 U.S. 118, 121 (1893)). While it is true that Mrs. Materasso was, as a technical matter, available to the defense just as she was to the Government, "in the context of the evidentiary inference to be drawn from a party's failure to call an available witness, the 'availability' of a witness … depend[s] … on all the facts and circumstances bearing upon the witness's relation to the parties, rather than merely on physical presence or accessibility." United States v. Torres, 845 F.2d 1165, 1170 (2d Cir. 1988) (quoting United States v. Rollins, 487 F.2d 409, 412 (2d Cir. 1973)). Specifically, "where the uncalled witness' 'relationship with one of the parties is such that the witness would ordinarily be expected to favor him' … 'then if such party does not

14

produce his testimony, the inference arises that it would have been unfavorable.'" Felice v. Long Island R. Co., 426 F.2d 192, 194-95 (2d Cir. 1970) (quoting McCormick on Evid., at 534 (1954)) (Friendly, J.).

In this case, Mrs. Materasso's testimony would ordinarily be expected to favor the Government. She was effectively the complaining witness, having initiated these proceedings by bringing her allegations to the attention of the state authorities and Probation. Unlike her mother, she witnessed the entire incident, not just the end of it. And she could presumably have testified to any essential element of the charged offense of which she had particular knowledge, for example, absence of consent. Thus, while the defense would not ordinarily be expected to have called her (and had no burden to do so), the same is not true of the Government. While other inferences are possible – the parties at various times made the Court aware of Mrs. Materasso's complicated life history, including apparent work as a Government informant – on balance the decision not to call her gives rise to the inference that her testimony would have been unfavorable to the Government's case.

In light of the above-described weaknesses in the Government's case,[7] the Court is unable to conclude, even to a preponderance standard, that defendant is guilty of Specification 1. Accordingly, the Court reaffirms its previous "bottom line" ruling finding defendant not guilty of Specification 1. As noted, Specifications 2 and 3 are also hereby dismissed. Sentencing on Specification 4 will

---

[7] The Court does not reach the question of whether to credit

take place on Thursday, February 19, 2015 at 4:00 PM.

SO ORDERED.

Dated:   New York, NY
         February 17, 2015

                                    _____
                                    JED S. RAKOFF, U.S.D.J.

---

defendant's own testimony, either in whole or in part.